IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN PHILLIPS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Civil Action No. 06-1338 |
| | ) | |
| RAMON RUSTIN; BRUCE DIXON, M.D.; | ) | |
| ALLEGHENY COUNTY JAIL; | ) | Chief Magistrate Judge Amy Reynolds Hay |
| ALLEGHENY COUNTY HEALTH | ) | |
| DEPARTMENT; ALLEGHENY | ) | |
| CORRECTIONAL HEALTH SERVICES, | ) | |
| INC.; THE COUNTY OF ALLEGHENY; | ) | |
| and CHRISTINE LEECH, | ) | |
| | ) | RE: Doc. Nos. 63 and 68 |
| Defendants | ) | |

## MEMORANDUM OPINION

John Phillips ("Phillips" or "the Plaintiff") filed this civil rights action pursuant to 42 U.S.C. § 1983. In Count I of the three count Amended Complaint (Doc. 84), he alleges that his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution were violated when he was denied timely medical care during the term of his incarceration at the Allegheny County Jail. Phillips bases a second section 1983 claim[1] against Bruce Dixon, M.D., Warden Ramon Rustin, and the municipal Defendants, for failing to train corrections officers in the recognition of serious injuries, and acquiescing in a custom that unduly delayed care to inmates needing immediate medical attention. In a third count, Phillips alleges a state law claim for medical

---

[1]The counts in the Amended Complaint are misnumbered. While the Plaintiff lists four counts, he omits Count II. Hence, the second section 1983 claim is set out at Count III.

malpractice.[2]  The Court addresses here the Defendants' pending Motions for Summary

Judgment.  The first of these (Doc. 63) was filed on behalf of the Allegheny County Jail ("the

Jail"), the Jail's Warden,  Ramon Rustin ("Rustin"), the Allegheny County Health Department

("the Health Department"), Allegheny County ("the County"), and Corrections Officer, Christine

Leech ("Leech").[3]  The second (Doc. 68 ) was filed by Bruce Dixon, M.D. ("Dixon"), the CEO of

Allegheny Correctional Health Services, Inc. ("ACHS"), and ACHS , a non-profit corporation

created to provide health care to inmates at the Jail.  Both Motions will be granted.

I.  _____Background

In the Amended Complaint, Phillips alleges that while he was incarcerated at the Jail on

or about May 21, 2005, he was struck in the eye by a handball during a game with a fellow

inmate (Doc. 84 at ¶12).[4]  He "immediately sought out [Leech], and requested medical attention.

---

[2]This count of the Amended Complaint does not specify against whom the claim for medical malpractice is made.  The Plaintiff refers only to the acts and conduct of a singular unidentified Defendant.

[3]Phillips recognizes that because discovery has enabled him to add Christine Leech as a Defendant, the fictional Defendants originally named in the Motion for Summary Judgment should be dismissed.  (Doc. 99 at p.1, fn1).  He also concedes that the Jail and "the Allegheny Correctional Health Department" were improperly named and should be dismissed.  Id.  The Allegheny Correctional Health Department does not exist.  In naming the entity that he intended to dismiss, the Plaintiff combined the names of Defendants Allegheny County Health Department and Allegheny Correctional Health Services, Inc.  The Court assumes that Phillips intended to dismiss Allegheny Health Department.  Claims against the Jail and the Health Department are duplicative of the claim against the County and will, therefore, be dismissed.  The claims against the individual Defendants in their official capacities are also duplicative of claims against the County.  Those claims, too, will be dismissed.  See Hafer v. Melo, 502 U.S. 21, 24-25 (1991).

[4]The record reflects significant confusion over the date of the accident.  In the original Complaint (Doc.1), Phillips alleges that he was injured on June 8, 2005. In his deposition, he testified that he remembered that the injury occurred in "early June or late May of 2005."  (Doc. 69-6 at p.42).  Later in the deposition, he testified that the accident must have been "around May 20."  (Id. at p.46).  He derived this date from a medical slip dated May 25, 2005, on which he noted that he had been hit in the eye "about a week ago."  (Id. at p.47).  "[T]hen I remember, it was late May, May 20th . . . ."  (Id.)  At a  later point, the questioning turned again to the May 25th medical slip.  Phillips admitted that seven days

2

(Id. at ¶13).   According to Phillips, Leech instructed him to fill out a standard form requesting

medical treatment.  (Doc. 97 at pp.9-12).  She allegedly assured Phillips that she would expedite

his request by leaving the form in the medical unit after her shift.  (Id. at p.9). Normal process

required that medical slips be left in a box on the pod where they would be collected by a clerk,

sorted by a nurse according to urgency, and used to schedule inmates' appointments. (Doc. 84 at

¶¶16, 17).  Phillips expected that he would be seen the next day.  (Doc. 97 at p.12).  There is no

record that a medical form was completed or delivered to the medical unit on the date of the

injury.  Leech testified that she does not remember interacting with Phillips, and had never been

presented with a complaint about an eye injury from any inmate.  (Doc. 97 at pp.117-119).

The next day, Phillips approached the medication nurse on his pod, complained of eye

pain, and requested Motrin.  (Id. at p.13).  She told him that she did not have any, and asked

Phillips whether he had completed a medical form.  (Id.).  When he said that he had, she stated

that he would be called soon.  (Id.).  When he did not hear from the medical unit, Phillips

submitted a second medical form dated May 25th, writing, "was hit in eye with handball a week

ago and irritation and pain still persist. Redness."  (Id. at p.32).  That form is marked to show

that it was received by the medical unit on May 26, 2005.  (Id.)  Phillips was seen on May 27th

by a nurse who is not a Defendant.  In her treatment note, the nurse wrote that Phillips

---

subtracted from the 25th would have placed the accident on May 18th.  (Id. at p.78).  Questioning
continued based on the assumption that Phillips had been hurt on that date.  See, e.g., id. at pp.81-82, 95.
In his Amended Complaint (Doc. 84), Phillips contends that the accident took place on May 21, 2005.  It
appears that Phillips chose this date because it was the only day within the relevant time frame that Leech
- or, apparently, any black female officer - was assigned to his pod.  At his deposition, Phillips testified
that the corrections officer on duty at the time of the incident - the officer to whom he complained - was
a black female.  (Doc. 66-2 at p.7).  Leech, referring to employment records kept by the Jail showing
which officers were on duty on specific pods on particular dates, testified that she was on Phillips's pod
on May 14, 2005 and was not assigned to that pod again until May 21st.  (Doc. 97 at pp.119-120).  She
did not work on the pod on May 22, 23, or 24th.  (Id.).

complained of drainage from and film in his eye, and saw "occasional streaking." (Id.). She also wrote that she did not observe drainage, redness or any other problem. She noted that Phillips was comfortable with follow up in the event that he experienced future problems, and described his condition as "stable." (Id.).

Phillips admits that he waited three weeks after the May27th evaluation to seek further treatment, and that he attempted to contact the medical unit only after he had lost his vision. (Doc. 69-6 at pp.62-63). He contends that he then completed multiple medical slips, notifying medical personnel at the Jail that he was blind. (Id.). According to Phillips, he did not receive a response to these requests, until he completed a form received by the medical unit on July 21, 2005. (Id. at p.63).[5] On the slip, Phillips reported "borderline blindness in left eye from a handball accident a couple months ago." (Doc. 90 at p.48). The treatment note associated with the July 21st medical slip is dated August 11, 2005, and reflects that Phillips had "lost vision in his left eye." (Id.) Where earlier he had been able to make out shapes and shadows, he "now can't see." (Id.). Phillips states that he was told that he had a cataract. (Doc. 70-6 at p.93). The person who generated this treatment note is not identified. This "provider" concluded that Dr. Patterson, the ACHS Medical Director, should consider referring Phillips for an ophthamology exam. (Doc. 90 at p.48). Dr. Patterson approved a referral the same day, citing "visual acuity left eye" and "remote trauma." (Doc. 90 at p.50). He checked a box on the referral form terming the request "routine." (Id.). Phillips contends that after he was seen by Dr. Patterson, he heard nothing, and complained to his group counselor, Mr. Issacs, about the difficulty

---

[5]Aside from the form dated May 25, 2005, the July 21st form is the only other medical slip produced by the Plaintiff.

securing medical care. (Doc. 70-6 at pp.92-93). According to Phillips, Issacs consulted Dr.

Mebane, a "psych doctor" who came to visit Phillips on his pod. (Id.). Phillips credits Dr.

Mebane with arranging for him to be seen by doctors at UPMC. (Id.)

On September 1, 2005, Phillips was evaluated by an ophthalmologist, Hazem Samy,

M.D., who concluded that Phillips had suffered a central retinal vein occlusion ("CVRO"), and

that the loss of vision in his left eye was irreversible. In his Findings and Recommendations,

Dr. Samy wrote:

> Central retinal vein occlusion left eye, will need to protect
> right eye as it is the only good one. Will need new glasses
> for eyes both to see better & to protect his right eye ASAP.
> Follow up with us here for possible laser treatment for
> neovascularization of his iris should it occur.
> [Return] in 2 weeks.

(Doc. 90 at p.50). The follow up visit was scheduled. (Id.). Phillips saw an ophthalmologist

again on September 15, 2005, (id. at p.64), but as of September 29, 2005, had not received his

glasses. On that date, Phillips completed a form titled "Inmate's Request to Staff Member,"

which was addressed to Dana Phillips, Chief Operating Officer of ACHS. (Id. at p.51). The

Plaintiff explained that he was not taken to an appointment at UPMC on September 22, 2005.

(Id.). Although it is not clear when Phillips received his glasses or was next seen at UPMC, the

medical record shows that he was evaluated in November, (id. at p.62), and underwent laser

treatment and an eye injection in December 2005. (Id. at pp.58-61). Phillips was seen again in

January 2006. (Id. at p.56).

In support of his claims, the Plaintiff has submitted an expert's report prepared by

Richard Sobel, M.D., M.P.H., who, based on his "years of experience in the medical care of

inmates and as medical director and contractor of prison health services," writes that Leech's decision "to ignore the potential for serious eye injury would have been a reckless act of indifference to the inmate's right to treatment, i.e. for a serious medical condition requiring emergency evaluation." (Doc. 45 at p.2). According to Dr. Sobel, corrections officers at Allegheny County Jail are not capable of recognizing or are not adequately trained to recognize the basic need for urgent medical evaluation when an inmate has suffered eye trauma. ( Id.). Dr. Sobel concluded that the unidentified nurse who examined Phillips on May 27, 2005 "demonstrated deliberate indifference to the inmate in that she excluded the potential for a vision threatening injury without an exam or referral to a medical provider for urgent evaluation." (Id. at p.3). This nurse's action was, in Sobel's opinion, at least partially attributable to inadequate training, oversight, review and quality assurance policies. (Id.). "Allegheny County Jail personnel acted with deliberate indifference to the serious medical needs of John Phillips." (Id. at p.5).

Joel D. Brown, M.D., a Pittsburgh opthamologist, provided a second expert's report, concluding that the handball injury "was the initiating factor that let [sic] to the loss of vision in [Phillips's left] eye." (Doc. 46 at p.1). "The injury probably caused injury or trauma to the anterior segment of the eye. This led to increased pressure in the eye or glaucoma, which subsequently led to the vein occlusion." (Id.). In Dr. Brown's opinion, "this could have been treated aggressively through medical and/or surgical means . . . [and] may have resulted in better control of Phillips's eye pressure, therefore deceasing the likelihood of his having a CVRO." (Id.).

Despite the fact that neither of the nurses is a Defendant in this matter, Phillips submits a third expert's report, prepared by Dana Bissontz, R.N., the President of Candan Legal Nurse Consulting. (Doc. 47). In her opinion, the nurse "who triaged Mr. Phillips failed to render appropriate and proper nursing care" when she failed to recognize "'red flags' for an eye injury indicating immediate need for care," thus delaying appropriate treatment. (Id.).

The Defendants' medical expert, Andrew Eller, M.D., a retina specialist and associate professor in the Department of Ophthalmology at the University of Pittsburgh, "disputes the severity of the ocular trauma that was purportedly sustained." (Doc.115 at p.3). He wrote, "To a reasonable degree of medical certainly I can state that immediate medical attention was not required . . . . [T]aking [Phillips] to an ophthalmologist for acute eye care was not necessary, and would not have altered the ultimate outcome for this eye." (Id.). "The cause of CVRO remains an enigma, but it has never been associated with blunt trauma. . . [B]lunt ocular trauma cannot induce a coagulopathy." (Id.) "No early intervention with medical or surgical treatment is available for a CVRO. When a CVRO is diagnosed, the recommended treatment is 'observation.' If iris neovascularization is identified . . . laser . . . treatment is advised. It should be noted that early laser treatment does not affect the ultimate outcome, or the course of the CVRO." (Id. at p.4).

II.     Standard of Review

A party seeking summary judgment must demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-moving party must respond by presenting evidence that a genuine issue of material fact compels a trial. (Id. at 324). In doing so, the non-moving party must point to specific facts rather than to "some metaphysical

doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).  This means that the non-moving party cannot defeat summary judgment by relying on unsupported assertions, bare allegations, or speculation.  <u>See</u> <u>Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.</u>, 172 F.3d 238, 252 (3d Cir.1999).  The mere existence of some evidence favoring the non-moving party will not defeat the motion.  There must be enough evidence with respect to a particular issue to enable a reasonable jury to find in favor of the non-moving party.  <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986).  In evaluating the evidence, the Court  must consider all facts and their reasonable inferences in the light most favorable to the non-moving party.  <u>See</u> <u>Pennsylvania Coal Ass'n v. Babbitt</u>, 63 F. 3d 231, 236 (3d Cir.1995).  The Court may not assess credibility or the weight of the evidence; it may determine only the existence of a triable issue of fact.  <u>Big Apple BMW of N. Am. Inc</u>., 974 F.2d 1358, 1362 (3d Cir.1992).  A motion for summary judgment will be granted where the materials in the record, if reduced to admissible evidence, would be insufficient to satisfy the non-moving party's burden of proof at trial.  <u>Celotex,</u>  477 U.S. at 322.

III.     <u>Analysis</u>

     A.  <u>The Constitutional Claims</u>

          In order to survive a motion for summary judgment on a section 1983 claim, a plaintiff must show that the defendant acted under color of state law, and that plaintiff was deprived of a federal constitutional right.  Because there is no dispute that the Defendants were state actors, the focus of the Court's analysis is whether any Defendant infringed upon Phillips's constitutional rights.

Phillips contends that his Eighth and Fourteenth Amendment rights were violated when, as a pretrial detainee,[6] he was forced to rely on the staff and medical personnel at the Jail to provide him with necessary medical care, and various Defendants delayed unreasonably in doing so. Because he was a pretrial detainee, Phillips's claims fall under the Fourteenth Amendment of the U.S. Constitution, rather than under the Eighth Amendment. See Hubbard v. Taylor, 399 F.3d 150 (3d Cir. 2005), and Montgomery v. Ray, No. 4248, 2005 WL 1995084, at *1 (3d Cir. Aug. 19, 2005) ( proper standard for examining such claims is whether delay of medical care constituted punishment prior to adjudication of guilt) (citing Bell v. Wolfish, 441 U.S. 520 (1979)).

In Hubbard, the Court of Appeals for the Third Circuit clarified that the Eighth Amendment standard acts as a floor for due process inquiries into medical claims made by pretrial detainees. 399 F.3d at 165-67. These inmates retain at least those constitutional rights enjoyed by convicted prisoners with respect to the conditions of confinement. Bell 441 U.S. at 545 (1979). Neither the Court of Appeals for the Third Circuit nor the Supreme Court has drawn the precise contours of the standard applicable to a pretrial detainee's Fourteenth Amendment claims relating to medical care. See Wood v. City of Lancaster, No. 06-3033, 2009 WL 80306, at *15 (E.D. Pa. Jan.13, 2009). To date, the Court of Appeals has applied the Eighth

---

[6]There is confusion in the record regarding whether Phillips was a pretrial detainee or was serving a post-conviction sentence. The Court need not resolve this issue because the Court of Appeals for the Third Circuit has applied the same standard to all inmates.

9

Amendment standard to these claims. See Natale v. Camden County Corr. Facility, 318 F.3d 575, 581 (3d Cir. 2003) (citing Boring v. Kozakiewicz, 833 F.2d 468, 472 (3d Cir. 1987)).[7]

Under this standard, Phillips must show that: (1) he had a serious medical need; and (2) prison officials demonstrated deliberate indifference to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity of a doctor's attention." Monmouth County Corr. Inst. Inmates v. Lozano, 834 F.2d 326, 347 (3d Cir. 1997). Deliberate indifference is determined subjectively, meaning that a prison official is deliberately indifferent only when she knows of and disregards an excessive risk to inmate health or safety. Farmer v. Brennan, 511 U.S. 825, 837 (1994). Negligence, while it may support a medical malpractice claim, does not rise to the level of deliberate indifference. Estelle v. Gamble, 429 U.S. 97, 105-106(1976).

With these principles of law in mind, the Court turns to the claims made against the various Defendants.

1. Christine Leech

A detainee's claims based on delay of medial care must be assessed "in the totality of the circumstances in the detention setting." Hojnowski, 2009 WL 1175611, at *4. In Hojnowski, a case with facts substantially identical to those here, the Court wrote:

---

[7]Although the Court recognizes that at least one District Court within the Third Circuit has articulated and applied a less rigid standard to claims made by pretrial detainees under the Fourteenth Amendment than that applicable to claims made pursuant to the Eighth Amendment, see e.g., Hojnowski v. Primecare Med., No. 06-CV-1228, 2009 WL 1175611, at *4 (E.D. Pa. April 30, 2009) (applying reckless indifference rather than deliberate indifference standard); Wood, 2009 WL 80306, at *15-16 (same), the Court does not address an alternate standard because the Plaintiff failed to raise this issue.

> [T]reatment or a medical policy may qualify as punishment if it causes detainees "to endure such genuine privations and hardship over an extended period of time, that the conditions become excessive in relation to the purposes assigned to them." . . . [D]istrict courts must recognize that "the effective management of the detention facility . . . is a valid objective," with elements that are "peculiarly within the province and expertise of corrections officials," . . . . Unless the evidence demonstrates that officials have met the unique demands of prison management with an "exaggerated" response, "courts should generally defer to their expert judgment in such matters."

Id. (internal citations omitted).

Only Leech is alleged to have played a direct role in delaying Phillips's medical treatment. The record shows that Leech was on duty on the Plaintiff's pod on May 21, 2009, the date on which Phillips most recently alleged that he was injured. (Doc. 97 at pp.119-120). Phillips alleges that immediately following his injury, he sought out Leech, told her about the accident, and asked to go to the infirmary. (Doc. 97 at p.9). He complained that his eye hurt, watered, and was red, telling her that "like the left side of [his] vision was - it seemed like it was - like it was like blurry a little bit." (Id. at p.11). Plaintiff further asserts that despite these complaints, Leech failed to seek immediate medical intervention. Instead, she offered to take a completed medical slip directly to the medical unit.[8] (Id. at pp.9-12). Leech testified at her deposition that she does not remember the injury or interacting with Phillips. (Id. at p.114). She stated that she dealt with inmate medical complaints infrequently - about twice per year - and in her six years at the Jail had never been presented with complaints of an eye injury from any prisoner. (Id. at pp.114,118-119).

---

[8]Phillips does not allege that Leech intentionally failed to deliver this slip.

11

Leech also testified that she had not received training in evaluating eye injuries, and that whether such an injury required immediate treatment was a matter of judgment. (Id. at p.115). She said that if an eye were swollen or bleeding, or an inmate were adamant about pain or the need for immediate medical care, she would call the medical unit. Otherwise, she would have the inmate complete a medical slip. (Id.).

On May 22nd, Phillips saw the medication nurse on his pod, complaining of eye pain. This nurse did not conclude that Phillips needed immediate medical attention. Instead, she verified that Phillips had completed a medical slip, and told him that he would be called. (Doc. 66-2 at p.13). When Phillips had not been scheduled for a medical appointment by May 25th, he completed a second form. (Id. at p.32). The form was received in the medical unit on May 26th, and a nurse came to his pod to evaluate his eye on May 27th. She concluded that he did not need further treatment unless his symptoms worsened. (Id.).[9]

A Fourteenth Amendment claim based on delay of medical care has two prongs, each with a rigorous standard of proof. Phillips must establish first that he came to Leech with a serious medical condition, meaning that the injury to his eye was such that failure to secure immediate treatment could have been expected to lead to "substantial and unnecessary suffering, injury, or death." Woloszyn v. County of Lawrence, 396 F.3d 314, 320 (3d Cir. 2005) (citing Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991)). The Court need not analyze the record with respect to this first prong, because even if it assumes that Phillips's

_____

[9]Nowhere in his Amended Complaint or in his opposition to the Motions for Summary Judgment does Phillips articulate a claim based on delay in or denial of medical care attributable to any of the medical professionals who saw or treated him. He focuses only on the lack of training provided to corrections officers, and the delay in treatment caused by what he alleges was the use of medical slips as the only means of securing treatment.

injury satisfied this criterion, the record will not support a finding that Leech, in having Phillips complete a medical form, acted with deliberate indifference - the second prong of a viable Fourteenth Amendment claim.

The test for accessing deliberate indifference is subjective, requiring a plaintiff to show that the defendant had actual knowledge of a serious health risk, and consciously disregarded that risk so as to inflict punishment. Johnson v. Doughty, 433 F.3d 1001, 1010 (7th Cir.2006) (citing Farmer, 511 U.S. at 837-38). Inadvertent failure to secure timely medical care does not establish the requisite state of mind. Wilson v. Seiter, 501 U.S. 294, 297 (1991). The primary theme of Phillips's case is that "Defendant Leech lacked the requisite knowledge to realize that an eye injury is serious and requires urgent medical attention." ( Doc. 99 at 8). Leech cannot, therefore, have been deliberately indifferent, and Phillips's constitutional claim against her fails.[10] It is what she *knew*, not what she should have known, that is dispositive.

Even were the Court to apply a reckless indifference standard, the Plaintiff's claim against Leech has an additional fatal flaw. Where, as here, the Fourteenth Amendment claim is based on delay in providing medical treatment, the delay does not rise to the level of a constitutional violation unless it results in substantial harm. See Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir.1993) (emphasis added). See also Laughin v. Schriro, 430 F.3d 927, 929 (8th

---

[10]Plaintiff's own expert establishes that Leech's conduct did not rise to the level of deliberate indifference. Dr. Sobel describes Leech's conduct as "reckless indifference,"stating that she exhibited "reckless disregard to [sic] the obvious potential of an eye emergency. A reasonable lay person *should know* that such an injury should be evaluated by a medical professional urgently." ( Doc. 45 at pp.1-2) (emphasis added). He then states: "It is my opinion that Ms. Leech, even at the time of her deposition, *lacks the requisite knowledge to realize* that an eye injury is serious enough to require urgent medical evaluation. (Id. at p.2) (emphasis added). Finally, Dr. Sobel concludes that "correctional officers at [the] Jail are not properly capable [of] nor [sic] adequately trained to recognize the basic need for urgent medical evaluation for an inmate after eye trauma and possible other injuries." (Id.).

Cir.2005) (claim based on delay of medical treatment cannot succeed absent medical evidence showing detrimental impact of delay); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir.1985) (same). The Court of Appeals for the Third Circuit recognized this principle in Brooks v. Kyler, 204 F.3d 102, 105 n.4 (3d Cir. 2000) (Fourteenth Amendment claim failed where prisoner-plaintiff "presented no evidence of any harm resulting from a delay in medical treatment").

The delay attributable to Leech's alleged failure to secure immediate treatment for Phillips was no longer than six days.[11] Leech interacted with Phillips on May 21st, and he was evaluated by a nurse on May 27th. What happened from May 27th forward had nothing to do with Leech. While a six day delay in securing medical treatment for some injuries obviously could result in significant harm, the Plaintiff fails to point to evidence that it did so here. In fact, the record supports the opposite conclusion. At his deposition - when Phillips was operating under the assumption that the accident happened on the 18th of May, a week prior to his completion of the medical slip dated May 25th - the following exchange took place:

> Q. Okay. Do you know if the wait between the time of the accident and a week, May 27th, May 25th or May 27th, nine days made any difference in the progress of your injury?
>
> A. I'm not a doctor.
>
> Q. Have you ever heard that from any source, from anybody?
>
> A. No; I never heard anything like that.
>
> Q. Have you ever asked any individual, whether it's a treating doctor, Dr. Samy, or anyone else, whether the wait of seven days

---

[11]This assumes that Phillips's time line is accurate, and that it was reasonable for him, in the face of his allegedly severe and persistent symptoms, to wait until May 25th to fill out a second medical slip.

or nine days made a difference in whether your eye was going to be saved or not?

A. I asked them if four months, you know, I - that's what I asked them. I said why did it take four months; that's what I said.

(Doc. 66 at 98).

When all of the record evidence concerning Leech is analyzed, it is clear that Phillips has not established a Fourteenth Amendment violation, and that Leech is entitled to summary judgment.

## 2. Rustin

Phillips contends that Rustin participated in the violation of his constitutional rights because he "is responsible for ensuring that there is a policy to make sure that Corrections Officers are appropriately trained to recognize serious medical needs of inmates," (Doc. 99 at p.2), and is "responsible for having the corrections officers trained with regard to responding to inmate medical needs." (Id. at p.5). Because Rustin failed to act, Phillips says, corrections officers were not provided with information as to what should be done if an inmate presents with a severe eye injury. (Doc. 99 at p.3).[12]

A claim for supervisory liability or liability based upon a failure to train is established where: (1) an existing policy created an unreasonable risk of constitutional injury; (2) the

---

[12]While it is true that corrections officers were not instructed regarding eye injuries, they were given guidance in distinguishing among categories of injuries - those that are life threatening, emergent, non-emergent but serious, and non-emergent and not serious. (Doc. 98 at pp.24-27). Signs and symptoms of some common emergency conditions were included in the training. See, e.g., id. at p.17). In his deposition, Dr. Dixon testified that the list of emergency conditions was not meant to be all-inclusive, but was intended as a general guide. (Doc. 90 at pp.80-81). Leech testified that she believed that she had been given this training. (Doc. 97 at p.116). Although she did not recall when, she knew that she had seen a presentation of the training materials. (Id.).

supervisor was aware of the potential for this unreasonable risk; (3) the supervisor was deliberately indifferent to the risk; and (4) the injury resulted from the policy or practice.  Sample v. Diecks, 885 F.2d 1099. 1118 (3d Cir.1989).  "It is not enough for a plaintiff to argue that the alleged injury would not have occurred if the supervisor had 'done more.'  He must identify specific acts or omissions of the supervisor that evidence deliberate indifference and establish a link between the act or omission and the ultimate injury."  Diaz v. Carroll, 570 F. Supp. 571, 577 (D. Del. 2008) (quoting Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001)).

The record contains nothing to suggest deliberate indifference on Rustin's part.  Furthermore, the Court has already determined that Leech's action in not reporting Phillips's injury the day it happened - even if it was the result of inadequate training attributable to Rustin - did not constitute a constitutional violation.  If Leech is not liable, Rustin cannot be liable.  Because at least two elements of a valid supervisory claim or failure to train claim are missing, Rustin is entitled to summary judgment.

3.  Dixon

Phillips's claim against Dixon is also based on an alleged failure to train.  In the Amended Complaint, Phillips alleges that "Dixon is responsible for ensuring that there is a policy to make sure that [the Jail's] Corrections Officers are trained to recognize serious medical needs of inmates.  The Health [R]elated [T]raining [M]anual for Corrections [O]fficers [does not have] a section . . . regarding what a Corrections Officer should do if presented with an inmate with a severe eye injury."  (Doc. 89 at p.2).  According to Phillips, Dixon developed, knew of,

and approved this constitutionally inadequate policy.[13]  As was the case with Rustin, there is no

evidence that Dixon was deliberately indifferent to a known risk of constitutional injury, or that

any inadequacy in the policy formulated for and delivered to corrections officers caused such

injury.  Dixon, too, is entitled to summary judgment.

### 4. ACHS and the County

### a. Failure to Train

ACHS is a municipal entity.  See Schuenemann v. U.S., No 05-2565, 2006 WL 408404,

at *2 (3d Cir. Feb. 23, 2006).  Municipalities, are "persons" for purposes of section 1983, and

may be liable for constitutional torts when: (1) the plaintiff's harm was caused by a constitutional

deprivation; and (2) the municipal entity is responsible for that violation.  Collins v. City of

Harker Heights, 503 U.S. 115, 120 (1992).  A municipal entity may not be held vicariously liable

for the constitutional violations of its agents under a theory of respondeat superior.  Id. at 122.

Rather, liability attaches "when execution of a government's policy or custom, whether made by

its lawmakers or by those whose edicts or acts may fairly be said to represent official policy,

---

[13]Dixon did not have any individual role in formulating, administering, or approving the policy addressing the training of corrections officers.  At his deposition, Dixon was questioned regarding the extent of his "involvement in creating the policy and procedure regarding the operation of ACHS."  (Doc. 90 at p.74).  He responded: "We [The ACHS Board of Directors] create very few.  We approve the policies that are brought forth by the executive, the chief operating officer and the staff of the organization."  (Id.).  The following exchange then took place:

> Q.  The answer is, really, as CEO, you don't create any policies?
>
> A.  That's correct.

(Id. at p.75).  Dixon also testified that as an ACHS Board Member, "he was responsible for insuring that there is a policy to make sure that [medical] care is provided.  [He was] not responsible for the day-to-day operation of how, when or anything else that's provided."  (Id. at p.77).  That responsibility fell to Dana Phillips and her staff.  (Id.).  Phillips has not made a supervisory claim based on the conduct of these ACHS employees.

inflicts the injury that the government as an entity is responsible for under § 1983." <u>Monell v. Dept. of Social Services</u>, 436 U.S. 658, 694 (1978).  A municipality may be liable under section 1983 for a failure to train only where such failure reflects a policy of deliberate indifference to the constitutional rights of citizens.  <u>See</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 390-91 (1989).

In seeking to fix liability on each of these Defendants, Phillips again relies on a failure to train theory, arguing that corrections officers at the Jail were not adequately instructed in distinguishing between serious and non-serious medical conditions.  As the Court has noted repeatedly, the record does not show that a lack of additional training for corrections officers resulted in cognizable injury.[14]  The municipal Defendants' Motion for Summary Judgment on the failure to train claim will, therefore, be granted.

### b.  Custom - Medical Slips as the Sole Means of Access to Medical Care

Phillips alleges that at the time of his eye injury, "the use of medical slips [had] become virtually the only method by which inmates were capable of requesting medical attention short of complaining of chest pains or a heart attack."  (Doc. 89 at p.10)  According to Phillips, this practice and the lack of training given to corrections officers worked "in tandem to create a

---

[14]Even assuming that Phillips had established a constitutional injury and causation, his failure to train claims against Rustin, Dixon, ACHS, and the County fail because Phillips has not shown that any of these Defendants acted with deliberate indifference.  Phillips does not address the deliberate indifference standard, and has failed to point to evidence showing that ACHS, the County, or any other Defendant was aware of information bearing on the need to revamp policy in this area.  Courts have regularly held that "more proof than a single incident is necessary to establish the requisite fault on the part of the municipality and the causal connection between the 'policy' and the constitutional deprivation."  <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 824 (1985).  Phillips has not alleged that any inmate - other than Phillips - suffered injury due to a correction officer's inability to identify the severity of a condition, or that even one other inmate suffered an eye injury.

system whereby an injury such as the Plaintiff's, [sic] would be ignored or sloughed off." (Id. at p.12).

Phillips's allegation regarding the misuse of medical slips is based on the municipal Defendants' custom rather than a formal policy. "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy or edict." Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir.1990) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). Custom, on the other hand, is shown by evidence that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law. Id. See also Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989) ("Custom may be established by proof of knowledge and acquiescence.").

The burden on a plaintiff seeking to establish section 1983 municipal liability based on a custom is substantial. The Supreme Court stated in Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397(1997):

> [I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Id. at 404 (emphasis in original); see Monell, 436 U.S. 658, 691, (1978).

This claim does not merit extended discussion. Even assuming, arguendo, that the Plaintiff is correct in arguing that a custom was in place making the completion of medical slips

the sole means of securing medical treatment, his claim would fail.  Through use of these slips,

Phillips was evaluated by a medical professional within six days of his injury, and has not shown

that during this period he suffered harm that he would not have suffered otherwise.  In other

words, he has not established that the municipal defendants were the "moving force" behind a

constitutional violation.  See Startzell v. City of Phila., 533 F.3d 183, 204 (3d Cir.2008).[15]  On

this claim, too, the municipal Defendants are entitled to summary judgment.

      B.  The State Law Claims

---

[15] In the interest of thorough analysis, the Court notes that its review of the record does not support the Plaintiff's argument that the municipal Defendants acquiesced to limiting the means of access to medical care, or that they failed to act to reduce delay associated with the use of medical slips.  The Plaintiff attempts to establish knowledge and acquiescence on the part of Dixon alone by citing selectively from minutes of the ACHS Medical Administrative Meetings held during February and March, 2002.  The Plaintiff first cites one sentence from the February minutes reflecting that a "two-day delay on sick call" had been reported.  (Doc. 98 at p.31).  He then cites Dr. Patterson's statement in the March minutes that "some inmates felt they were not being seen quickly enough, and therefore, complained of chest pains so that they would be seen immediately."  (Id. at p.34).  On the basis of these excerpts, Phillips argues: "Defendant Dixon was present at both of these meetings and was accordingly, [sic] aware of this problem with the [medical] slips being utilized for requesting virtually any kind of medical attention."  (Doc. 89 at p.10).

There are a number of problems with this argument.  First, Dixon was not the ultimate decision maker with respect to how medical care was accessed.  (Doc. 80-5 at pp.21-22).  Next, these minutes are from 2002, more than three years before Phillips was injured, and do not permit any reliable conclusion about the delivery of medical care in 2005.  Third, the fact that inmates complained about not having been seen soon enough does not establish that medical emergencies were being ignored.  Finally, when the minutes cited are assessed in their entirety, it is clear that meeting attendees were attempting to reduce delay by staffing the clinic on the weekends, hiring additional medical staff, evaluating inmates on the pods in order to eliminate having to wait for escorts to the medical unit.  It is also clear that corrections officers were regularly calling the medical unit to have prisoners seen, or sending inmates directly to the unit rather than using medical slips.  The minutes of the March meeting reflect that the corrections staff would be instructed to call the medical unit to see if the nurse was free to see an inmate. If an inmate could not be accommodated immediately, the nurse would call back.  (Doc. 98 at p.34).  It was stressed that the medical slips were to be used in *non-urgent* cases.  (Id.)(emphasis added).  These minutes, even when considered against the background of the record evidence as a whole, do not show that the municipal Defendants "turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights."  Natale, 318 F.3d at 584.

Because grating the Defendants' Motions for Summary Judgment resolves all of the federal claims, the Court exercises its discretion, declining to exercise supplemental jurisdiction over the state law claims.  See King v. County of Gloucester, No. 07-3954,  2008 WL 5158744, at *6 (3d Cir. Dec. 10, 2008) (quoting Novak, 503 F.3d 572, 583 (6th Cir.2007) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims.")).  The Court does not find that any factor favors its consideration of the pendant claims, and will dismiss them.

IV.  Conclusion

Although the Court is not unsympathetic to Plaintiff's tragic loss of vision, federal law does not provide a remedy in this case.  The Defendants' Motions for Summary Judgment will be granted.  Appropriate Orders follow.


_____
/s/ *Amy Reynolds Hay*
Chief United States Magistrate Judge

Dated :  17 June, 2009

cc:      Counsel of Record via CM-ECF\_\_\_\_